# City of Reading *v.* United Traction Company, Appellant.

*Street railways—Rate of fare—Strip tickets—Ordinance—Agreement—Equity.*

Where a street railway company and a city enter into negotiations relating to the construction of an extension or loop between two of its lines, and as a result of the negotiations an ordinance is passed granting permission for the extension and providing that "the rate of fare shall not exceed five cents for a single fare, or six tickets for twenty-five cents," this being the rate of fare prior to the passage of the ordinance, neither the street railway company, nor another company to which it has leased all its lines, can subsequently abolish the sale of six tickets for twenty-five cents to or from points on the two lines for which the extension or loop was allowed by the city.

Argued Feb. 27, 1912. Appeal No. 58, Jan. T., 1912, by defendants from decree of C. P. Berks Co., Equity Docket, 1911, No. 1053, on bill in equity in case of City of Reading v. Reading Transit Company, United Traction Company and Front and Fifth Street Railway Company. Before FELL, C. J., BROWN, MESTREZAT, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an injunction. (See Reading v. United Traction Co., 232 Pa. 303.)

ENDLICH, P. J., found the facts to be as follows:

1. In 1906 the entire street railway system of the city of Reading, made up of a number of lines belonging to independent companies, was, under leases executed by them to the United Traction Co., operated as a whole by the latter, including a line on Front and certain other streets belonging to the Front & Fifth Street Railway Co., and another on Schuylkill avenue belonging to the Reading City Passenger Railway Co.

2. Complaints made to the city authorities by resi-

dents in the vicinity of a turn-out on Schuylkill avenue near Buttonwood street about the noise occasioned at night by the reversing of cars were by those authorities brought to the attention of the United Traction Co., with a request to have the nuisance remedied.

3. In response to this the city was by Dr. Walter A. Rigg advised, not only that the cause of complaint would, as far as practicable, be abated, but that it might be entirely removed and at the same time the convenience of the traveling public greatly enhanced by the construction, with the city's permission, of a track connecting the two lines of railway above mentioned along and upon two intervening blocks of Windsor street, the two lines thus connected forming a so-called "loop."

4. This suggestion being reported to the City Councils, the matter was referred to the Railway Committee for consideration. Between it and Dr. Rigg as representing the railway companies interested there were various consultations and communications,—among the latter a letter from Dr. Rigg to the chairman of the committee, dated Oct. 6, 1906, and written upon the letter-head of the United Traction Co., in which, in the event of the grant of permission to construct the "loop," it was stated (1) that the turn-out should be removed, (2) that there should be "no increase of fare," and (3) that the "fare limit" should be Buttonwood street, a single fare carrying a passenger from any part of town to any point on Schuylkill avenue or around the "loop" to Front and Buttonwood streets, and as to incoming passengers a single fare being good from Schuylkill avenue and Buttonwood street and points beyond, around the "loop" to any part of the city,—the fare charged at the time by the United Traction Co. for a single trip on any part of its system being 5 cents or a ticket obtainable at the option of passengers by purchase from the conductors on the cars in strips of 6 tickets costing 25 cents.

5. The committee on Oct. 7, 1906, largely actuated by the letter just adverted to, reported to councils upon the matter referred to it as one between the city and the United Traction Co., recommending the grant of permission to make the connection suggested as above detailed and the passage of an ordinance for that purpose. Accompanying the report was the draft of an ordinance handed to the committee by Dr. Rigg, and so drawn as to grant the privilege in question to the Front & Fifth Street Railway Co., it having been explained to the committee by Dr. Rigg that the United Traction Co. was an operating and not a constructing company, and that therefore the grant must be made to the former. The ordinance was in due course passed with the addition of certain provisions, among which was that embodied in Sec. 2 thereof, viz, "That the rate of fare shall not exceed five (5) cents for a single fare, or six tickets for twenty-five (25) cents,"—and as passed was approved Dec. 8, 1906.

6. Within a few days thereafter the Front & Fifth Street Railway Co. filed in the office of the city clerk its formal acceptance, required by the ordinance, of the same and "all the conditions thereof." Thereupon the connecting line was constructed and at once passed under the control and operation of the United Traction Co. The stipulations contained in the letter of Oct. 6, 1906, relative to the removal of the turn-out on Schuylkill avenue, the fare limit and the fare itself were carried out, the United Traction Co. accepting for a single fare from Schuylkill avenue and Buttonwood street around the "loop" to any part of the city 5 cents in cash or one of 6 tickets sold in strips for 25 cents.

7. Throughout the negotiations and transactions above detailed the city of Reading conceived itself to be dealing with the United Traction Co., as the company in control of the entire street railway system, representing the underlying corporations and in the operation of the system to be perfected by the "loop" agree-

ing to be bound by the stipulations and conditions inducing and attached to the grant of permission to construct it.

8. The precise official connection of Dr. Rigg with the United Traction Co. and its lessor corporations, including the Front & Fifth Street and the Reading City Passenger Railway Cos., is not established by the evidence. Whilst apparently not existing or defined by any explicit employment of him as an agent with designated powers of any of these companies, the fact nevertheless is that in the transactions and negotiations concerning the "loop," as well as in other previous matters, he, with their knowledge and acquiescence, acted as the general representative of the United Traction Co., and through it of its various lessor corporations, in their dealings with the city; that his authority in every instance and particular so to act was implicitly recognized by all said companies as well as assumed by the city; and that the United Traction Co. and the Front & Fifth Street and Reading City Passenger Railway Cos. accepted the benefits and advantages secured for them from the city by him upon the faith of the representations, stipulations and conditions made or agreed to by him in their behalf.

9. About March 18, 1910, the United Traction Co. discontinued the sale of strip tickets over its entire system, collecting a straight 5 cent fare from passengers, the fare limit above mentioned remaining unchanged. On March 21, 1910, the mayor of the city addressed to the president of said company a letter calling his attention to the alleged duty of the company to sell strip tickets over its entire system, requesting compliance therewith, and advising him of the city's purpose in the contrary event to institute proceedings to compel it. The answer of the president of the company to this letter, dated the same day, denied the existence of the duty on the basis of Dr. Rigg's letter of Oct. 6, 1906. Thereupon, on March 30, 1910, the city filed a bill to

compel the sale of tickets over all the railway lines in the city. After its dismissal by the Supreme Court, July 6, 1911, this bill was filed on Sept. 22, 1911.

10. By a 999 year lease dated as of Apr. 1, 1910, acknowledged May 5, 1910, and recorded Aug. 17, 1910, the United Traction Co. leased its entire street railway system, including the "loop," to the Reading Transit Co. At the date of the filing of this bill the company in actual control of the street railways in the city of Reading, and operating them, was the Reading Transit Co.

11. The operation of the "loop" in connection with the remainder of the system is as follows: cars leaving the car-barn on North Ninth street come in Ninth to Penn, down Penn to Fourth, out Fourth to Washington, down Washington to Front and Schuylkill avenue, out Schuylkill avenue and around the "loop" over the tracks of the Front & Fifth Street Railway Co. to Front and Schuylkill avenue, in Washington to Second, in Second to Penn, up Penn to Tenth and out Tenth to the car-barn,—or from Second up Penn to Nineteenth and Perkiomen avenue, and thence starting another circuit down Penn to Fourth, etc. In either case the circuit, covered by two fares, is about 7 miles, the trip in one direction covered by one fare being about 3½ miles, of which 5,850 feet are over tracks of the Front & Fifth Street Railway Co., and about 1,300 of this distance over the extension authorized by the ordinance of Dec. 8, 1906.

12. The travel beginning and ending upon the Front & Fifth Street line is insignificant; that beginning at Schuylkill avenue and Buttonwood street, or points beyond, and ending at points along Penn street or beyond, very heavy.

### LEGAL CONCLUSIONS.

A—The suggestion of the construction of the "loop" as something to be permitted by the city of Reading

having been made by Dr. Rigg in the interest, not only of the Front & Fifth Street Railway Co., but also of the United Traction Co. as the company operating the entire street railway system of the city and with a view to its more convenient operation,—the negotiations relative thereto with the city authorities having been conducted by him in the interest of both companies with their acquiescence,—the city having treated him and with him as their authorized representative therein and acted upon his statements and promises as made in their behalf,—said companies having accepted the fruits of his dealings and negotiations and representations with and to the city, and at the time and for a number of years thereafter treated them as binding,—and the president of the United Traction Co., having subsequently so recognized his undertakings,—neither company can now be heard to dispute, on the ground of want of antecedent authority in him to represent said companies, either the fact that from the inception of said negotiations, etc., he did represent them and that through him as their representative they were both parties to said negotiations, etc., or the binding force as to both of any undertakings made by him on their behalf in the premises, which entered as an inducement into the grant of the privilege to construct the "loop."

B—In the light of the nature and scope of said undertakings, the circumstances surrounding the introduction and passage of the ordinance approved Dec. 8, 1906, the situation of the several parties concerned, and the manifest objects aimed at, the grant by the city of Reading of permission to construct the "loop" must be regarded as a transaction not only between the city and the Front & Fifth Street Railway Co. as the constructing company, but also between the city and the United Traction Co. as the company operating the entire street railway system of the city including the "loop," and the terms and provisions of said ordinance are to be understood and given effect accordingly.

C—So understood, the grant of said permission and the acceptance of the terms thereof involved a contract between both said companies and the city to the effect that in the operation of the railway lines including the one circuit the extension perfecting the "loop," the fare-limit should be the intersection of Schuylkill avenue and Buttonwood street; that a fare paid at that point or any point beyond should entitle the passenger to carriage to any part of the city reached by the car on which it was paid or any to which he might be transferred; that such fare should be, at the option of the passenger, 5 cents cash or one of 6 tickets to be sold him on the car for 25 cents; that payment of his fare by ticket should entitle him to the same transportation as payment by 5 cents in cash; and that this contract established a condition of the grant of the permission to construct the "loop," to be performed in its operation, as such accepted by the Front & Fifth Street Railway Co. and impliedly assented to by and obligatory upon any company operating said line, immediately or mediately under the Front & Fifth Street Railway Co., in connection with any portion of the remainder of the street railway system of the city, with said "loop" forming and operated as a continuous circuit, and therefore binding upon the Reading Transit Co.

D—The plaintiff is entitled to a decree enforcing the contract and condition mentioned in the foregoing conclusion in accordance with their terms and effect as there stated and with prayers 1 and 2 of plaintiff's bill.

E—The costs of this proceeding are to be paid by defendants.

*Error assigned* was decree in favor of the plaintiff.

*Isaac Hiester* and *C. H. Ruhl*, with them *R. L. Jones*, for appellants.—Corporate rights are not to be frittered away by loose and unauthorized declarations, made by persons who, at the time, had no authority to bind the

corporation; and this principle applies as well to individual directors and employees of the corporation as to strangers: Allegheny County Workhouse v. Moore, 95 Pa. 408; Investment Co. of Phila. v. Eldridge, 175 Pa. 287; Junction R. R. Co. v. Penna. R. R. Co., 2 W. N. C. 277; Twelfth St. Market Co. v. Jackson, 102 Pa. 269; Copeland v. Stoneham Tannery Co., 142 Pa. 446.

Tickets, commutation books, etc., like transfers at certain points are details of management which the company may alter from time to time as circumstances require subject in this case to the expressed limitation of the price of tickets: Philadelphia v. Philadelphia Rapid Transit Co., 224 Pa. 544; Phila. v. Phila. Rapid Transit Co., 228 Pa. 325.

*Henry P. Keiser,* City Solicitor, for appellee.—In construing the ordinance, such construction should be made strictly against the company exercising the same and in favor of the public: Edgewood Borough v. Scott, 29 Pa. Superior Ct. 156; Southwestern State Normal School, 213 Pa. 244; Johnson v. Philadelphia, 60 Pa. 445; West Bloomfield Township v. Detroit United Railway Company, 146 Mich. 198 (109 N. W. Repr. 258).

OPINION BY MR. JUSTICE BROWN, April 29, 1912:

The question before us in Reading v. United Traction Company, 232 Pa. 303, was whether the right of the Reading Transit Company, the successor of the United Traction Company, to discontinue the sale of strip tickets at the rate of six for twenty-five cents, good on all of its lines, had been taken from it by the ordinance of December 8, 1906, and it was held that such right had not been affected by the ordinance. In so holding we said that nothing in the letter from Dr. Rigg to the chairman of the railways committee of the city councils "nor in the ordinance can be construed into an agreement by the United Traction Company to continue the general sale of strip tickets, and its right was,

and the right of the Reading Transit Company, its successor, is, to charge a fare of five cents for every passenger riding on its lines, except as it may be committed by the ordinance of December 8, 1906, to continue to sell six tickets for twenty-five cents, good to or from points on the Schuylkill avenue and Front and Fifth street railway lines. That question, however is not to be passed upon until it is properly raised." The question which we declined to consider in that case, because it was not before us, was properly raised in this proceeding, and, in passing upon it, the learned chancellor below regarded it, as we intended it to be regarded, if raised, as an open one. He disposed of it just as we should have disposed of it, if it had been before us on the former appeal, and to his correct legal conclusions, following his properly found facts, but a word need be added.

The United Traction Company was bound by the pro· visions of the ordinance of December 8, 1906, and its lessee and successor, the Reading Transit Company, is now so bound. That ordinance provides that "the rate of fare shall not exceed five (5) cents for a single fare, or six tickets for twenty-five (25) cents." These words certainly mean something; but in their breach of good faith with the city of Reading, those in control of the affairs of the Reading Transit Company now assert that they mean nothing. The ordinance related to the Front and Fifth Street and Schuylkill Avenue lines. At the time it was passed the rate of fare on these lines was five cents, or a passenger, at his option, could purchase six tickets for twenty-five cents, each of which gave to him the same transportation rights and privileges as were given by paying a five-cent fare. The negotiations between Dr. Rigg and the chairman of the street railways committee of councils which led to the passage of the ordinance related to the two lines just mentioned, and it is trifling with judicial patience to contend that both parties so negotiating did not under-

stand and intend that, upon the completion of the loop, the mode of paying a fare should remain unchanged on the two lines and should continue to give a passenger the same transportation rights. The ordinance passed in pursuance of these negotiations became a contract between the city and the two lines and their lessee, and a fare paid on either line by a passenger with one of six tickets issued to him, at his option, as provided by the ordinance, entitles him to the same transportation as if he had paid a cash fare of five cents. No other conclusion could have been reached by the learned president judge below under the undisputed facts in the case, and the decree is affirmed at appellants' costs.